Read, J.,
dissenting. I can not concur in the opinion, that any person of less than half black or negro blood, has the right of an elector, under the constitution of Ohio.
The words of the constitution are (art. 4, see. 1,: “In all elections, all white male inhabitants above the age of twenty-one years shall enjoy the right'of an elector.”
Thus, color is a constitutional qualification of an elector in Ohio, and that instrument confers the enjoyment of the elective
franchise upon white persons only, and by the force of its terms, excludes all persons who are not white.
To hold, therefore, that all persons, less than half black, or less than half negro blood in their veins, have the right of electors *325 or voters, in the State of Ohio, is in my opinion, a direct and open violation, both of the letter and spirit of the constitution.
The constitution, in defining the color-qualification of an elector, does not employ the phrase — partly white — more white than black — all persons less than half black — but simply the word white.
The word “white” means pure white, unmixed. The word expresses a simple idea, quality, or principle, homogeneous, not made up or compounded of two different elements or qualities. A mixture of black and white is not white; white and black may be mixed in different proportions — they may be more white than black, or more black than white ; but a preponderance of the one or the other color will not make the mixture a pure white, or a pure black.
When the words white and black are employed to designate different races of men, they are applied to men of the same blood or stock. When applied to individuals, to designate the stock or race to which they belong, they mean that the individuals, thus designated, are purely of the blood of the white race or the black race. A man of mixed blood, partly white and partly black, can not be called a'white man or a black man, because those words import, that the person to whom applied is of pure blood of the white or black race. Nor does it matter about the preponderance of blood, if there be a mixture; he is of the pure blood of neither the one nor of the other. It is not the shade of color, but the purity of the blood, which determines the stock or race to which the individual belongs.
The word white has never been applied to persons of any shade of black or negro blood, to contradistinguish them from the full black. In speaking of such, the language is, “ he is quarter black,” a “light mulatto,” “nearly white;” always using some qualifying term. To say that a man is a white man, is to ^affirm that he has no black or negro blood in him; that he is of the pure, unmixed blood of the white race. Such is the meaning which has universally, and at all times, attached to the term “ white man.” It is an axiom in- the construction of written laws and constitutions, that words are to be taken in their ordinary and common acceptation. The word white, then, employed in the constitution, to define the color-qualification of an elector, limits the right of voting to white persons only, and excludes all others. To hold that *326 all pei’sons, less than half black, are voters under this clause of the constitution, is to hold that, all persons, Jess than half black, are white. To establish this .proposition, the reasoning would stand thus:
White persons are voters under the constitution of - Ohio; all persons are white who are less than half black; therefore, persons less than half black, are voters under the constitution of Ohio. Which reasoning proceeds upon the affirmation, that the part is equal to the whole; that more than half is all; that three-fourths white is white; that is, that three-fourths is equal to the whole.
But it is contended that there should be some limit — some certain and fixed rule upon the subject of color.. There can be no more certain and definite rule upon the subject than that which the constitution lays down. To say that no person can vote who is not white, is as definite as to say all persons are voters who are less than half black, and of far more easy practical application, because, where it would be easy to determine whether a man had any black blood in him, it might be impossible to determine the exact amount, in persons who were mixed. The whole difference strikes me to be this: that when the constitution has declared one rule upon the subject of color, a majority of this court havo declared a totally different rule, destructive of, and repugnant tor the one laid down in the constitution. Whether a man is white or black, is a question of fact; that the white man, only, shall have the right to vote, is a rule of law ; and that it may be difficult to determine whether, in a given case, the fact comes within the law, does *not impeach the rule of iaw as uncertain, but only proves that the question of fact is involved in doubt.
The position that all persons, less than half black, are white persons, possessed of the political rights of citizenship, is sup ported, neither by the examples or authority of other states, nor by the policy or practice of our own, nor by judicial decisions.
It has always been admitted that our political institutions embrace the white population only. Persons of color were not recognized as having any political existence. They had no agency in our political organization, and possess no political rights under it. Two or three of the states form exceptions. The constitutions of fourteen expressly exclude persons of color, by a provision similar to our own; and, in the balance of the states, they are excluded upon the ground, that they were never recognized as a part *327 of the body politic. This exclusion extends to all persons of any degree of black or negro blood; and, by the practice of no one of the states, have persons, only less than half black, been treated as white. I have not been able to find any judicial decision to this effect, and presume there is none. Our constitution was formed in view of this practice and prevailing sentiment; and the existence of a like prohibitory clause, respecting color, with our own, forces upon us the conclusion that, with the prohibitory clause, we adopted the construction which it had always received. Such is the construction which, in point of fact, we have always given our constitution; and, in practice, we have always excluded from the right of voting all persons of any degree of negro blood. Indeed, it is matter of history, that the very object of introducing the word -white into the constitution, by the convention framing that instrument, was to put this question beyond all cavil or doubt, by, in express terms, excluding all persons from the enjoyment of the elective franchise, except persons of pure white blood.
During our territorial organization, although the ordinance and the territorial act, designating the qualification of electors, employed the phraseology, “ all free male inhabitants,” *ete., yet no negro, or person of any degree of black blood, was ever permitted to vote. This fact is familiar to the old inhabitants, who resided here during our territorial organization. This phraseology might be subject to doubt; and, although persons of any portion of colored blood were not considered a part of the body politic, it might’be construed to embrace them. Hence, to avoid the possibility of such construction, the framers of our constitution extend the phraseology, from “free male inhabitants,” to “white male” inhabitants, and incorporated it into the constitution.
In the convention framing our constitution this question was matter of warm, if not bitter, discussion. A motion was made, on the report of the committee upon this clause, to strike out the word “white.” Amendments were proposed authorizing blacks and mulattoes residing in the territory to vote and to confer the like privilege upon their descendants; and, finally, in some way to recognize them as citizens by introducing a clause into the constitution excluding blacks and mulattoes from the right of voting, and prohibiting them from holding all office, either civil or mili *328 tary, but conferring upon .them all the rights of citizenship not expressly excepted in the constitution. This last proposition, if adopted, would so far have recognized persons of color as citizens, that the legislature could never have enacted laws to remove them from the state; and, employing the term “black and mulatto,” might have been construed to confer full political rights upon all persons less than half black or mulatto; although in Kentucky, where blacks and mulattoes are prohibited from political rights, all persons, of any degree of black blood, are held to be mulattoes. (Journal of Convention framing Constitution of Ohio.)
Judge Burnet, who is as familiar with the early history of Ohio as any man in the state, and was engaged in the practice of law in the territory, and had been prominently connected with the administration of its public affairs, remarks, in one of his historical letters upon this subject, published in the transactions of the Historical and Philosopical Society of Ohio, vol. 1, pt. 2, p. Ill: *“The result of those discussions was an abandonment of all the propositions which had been made, and a general conviction that a constitution should'be formed for the free white population of the district, who, alone, were represented in convention ; that its phraseology should be so guarded as to show that people of color were not considered as parties to the compact; and, as they had no agency in its formation, so they should have none in its administration.”
The same writer further observes that they were regarded in the position of the aborigines who remained in the state after they had ceded their land to the general government; that they have the moral right, whilst suffered to remain, to claim the protection of our laws, and to be treated with justice, and humanity, but, beyond that, they have no claim. Hence, we find, so early as 1804, followed up by another act in 1807, statutes discouraging the immigration of blacks into our state, and imposing upon those among us such conditions and restrictions as would induce a vast majority of them to quit the state. Thus we have denied them all constitutional right to remain even in the state; have passed laws to induce them to leave it, and carefully excluded all persons of any degree of negro blood from all participation in the enjoyment of our political rights. Indeed, the hope always has been cherished,¿ that the time would come when this unfortunate .race should be removed from our community, and placed in some position where *329 they could, among themselves, enjoy their own government, and administer its affairs; or, at least, that Ohio, which is free from slavery, should be rid of a population which, while they remain among us, must be miserable and degraded.
This exclusion of persons of color, or of any degree of colored blood, from all political rights, is not founded upon a mere naked prejudice, but upon natural differences. The two races are placed as wide apart by the hand of nature as white from, black; and, to break down the barriers, fixed, as it were, by the Creator himself, in a political and social amalgamation, shocks us as something unnatural and wrong. It strikes us as a violation of the laws of nature. It would be productive of no *good. It would de-
grade the white' if it could be accomplished without elevating the black. ' Indeed, if we gather lessons of wisdom from the history of mankind — walk by the light of our experience, or consult the principles of human nature — we shall be convinced that the two races never can live together upon terms of equality and harmony. The distinctions are too marked to be overcome by the power of political action, and the folly of the attempt will probably be only equaled by the fatal consequences of the result. In view of these •conclusions, and in this feeling, our constitution was formed, and such views and feelings have always directed the policy of the state. The practical construction which we have given our constitution for a period of more than forty years, has been to exclude all persons of all degrees of black or negro blood from the exercise or enjoyment of all political rights; and such was the practice under the far broader phraseology of our territorial or. ganization. The fact that (under the law excluding blacks and mulatto persons from giving testimony in all cases where white persons are parties) all persons less than mulatto, or half black, have been admitted as witnesses, is no authority against this uniform construction, because all persons of sufficient intelligence, without some positive prohibition, are competent to testify; the Arab, the Hottentot, or anybody else, only that such shall be sworn according to the forms of their own religious belief. Hence, a statute which excludes by name a certain class, shall not be construed to extend to classes not named; for, to carry out such construction, would exclude all persons.
The policy of the state always has been to discourage the immigration and settlement of persons of color among us. The de *330 cisión of this court, conferring political rights upon all less than half black, is an inducement for such to immigrate to the state and remain here. It violates the spirit of the constitution, because, in principle, I see no difference in allowing a mulatto to vote, and a person little less than mulatto, or a full black, for the tint of black blood extends to them all, and this is the reason of their exclusion.
*Tbus, it appears to me, for the reasons I have assigned, that wo are forbidden to give any other construction to the word “white,” in our constitution, than that it-excludes all persons not of the pure blood of the white race from the enjoyment of the elective franchise, and all participation in the exercise of political rights.